### In re ERVIN et al.

#### (District Court, E. D. Pennsylvania. June 10, 1901.)

#### No. 809.

1. BANKRUPTCY—CORPORATION AS PARTNER OF BANKRUPTS—ULTRA VIRES.
   Where a corporation entered into partnership articles with a firm, and embarked moneys in and sold goods to the firm, the corporation, to the extent of such acts, executed the contract of partnership by becoming a partner de facto, and could not, by asserting that the partnership agreement was ultra vires, prove a claim in competition with general creditors upon bankruptcy of the firm.

2. SAME—ADVANCES BY PARTNER.
   A partner cannot claim, in competition with firm creditors, for advances for partnership purposes or for goods sold to his firm.

3. SAME—ULTRA VIRES—CORPORATION.
   Where the ultra vires acts of the corporation in entering into and executing the contract of partnership induced general creditors to extend credit to the bankrupt firm, the corporation cannot be permitted to repudiate these acts, and transform itself, by virtue of its own wrongdoing, from a partner into a general creditor.

Upon Exceptions to Report of Referee Disallowing Claims.

Ervin, Page & Co., Incorporated, a corporation of New Jersey, for the sale, etc., of teas and coffees, doing business in Pennsylvania, filed claims for $10,773.33 and $7,565.78 as a general creditor of the bankrupt firm of R. T. Ervin & Co., composed of R. T. Ervin and Benjamin S. Fagan, doing business in Philadelphia and elsewhere in the sale of teas and coffees and the operation of restaurants.

The referee, Edward F. Hoffman, Esq., disallowed both claims, in a report as follows:

"The referee certifies to the court the following question as to the admission of a proof of claim, to which specifications of objections were filed by the trustee in bankruptcy, and upon which specifications the referee was requested by the attorneys for the creditor and the trustee to hear argument, and report to the court upon the law and the facts. The claim is objected to on the ground that the relation of partnership existed between the bankrupt firm and the claimant. The claimant is a corporation organized under the laws of the state of New Jersey, for the purpose of conducting a business in which it dealt in commodities largely used by the bankrupt firm. It entered into a written agreement of partnership with the bankrupt firm, by the terms of which it was to participate in the profits and management of the bankrupt's business. In the course of dealings under this agreement the bankrupts became indebted in a large amount to the claimant. It has pre-

sented a claim to the trustee in bankruptcy, and now seeks to participate in the distribution of the assets of the bankrupt on the ground that, being a corporation, the agreement under which the indebtedness was contracted, even if drawn in the terms of a partnership, was 'ultra vires,' and should not be considered as affecting its status as a creditor. The referee finds the following facts:

"(1) The firm of R. T. Ervin & Co., the bankrupts, was composed, at the time of the adjudication in bankruptcy, of Russell T. Ervin and Benjamin S. Fagan. The said firm of R. T. Ervin & Co. were successors to the firm of Barnes & Co., composed of R. T. Ervin and Barnes. Barnes left the business, and on October 15, 1897, Benjamin S. Fagan became associated with R. T. Ervin in the conduct of the business of Barnes & Co. On January 1, 1900, the firm name was changed to R. T. Ervin & Co.

"(2) The business of the firm of R. T. Ervin & Co. was the operation of restaurants and sale of tea and coffee. In connection with the Philadelphia restaurant, known as the 'Gondar Coffee Garden,' they had a tea and coffee department where they made sales of tea and coffee. Subsequently like restaurants were established in Pittsburg and Cleveland, though without departments for the sale of teas and coffees.

"(3) Ervin, Page & Co., Incorporated, the claimant, was a corporation organized under the laws of the state of New Jersey, of which Charles W. Ervin (a brother of Russell T. Ervin) was president, and E. Cary, secretary and treasurer. The place of business of this corporation was No. 43 South Front Street, Philadelphia, and the business engaged in was the 'importing and jobbing of teas and the roasting and sale of coffees.'

"(4) Ervin, Page & Co., Incorporated, had had some dealings with Barnes & Co., succeeded by R. T. Ervin & Co., and on December 15, 1899, entered into an agreement in writing with them, of which the following is a full copy: [Here appears copy of the agreement, dated December 15, 1899, between Ervin, Page & Co., Incorporated, and Russell T. Ervin and Benjamin S. Fagan, co-partners, trading as Barnes & Co., set forth in the brief.]

"(5) In pursuance of the agreement cited, Ervin, Page & Co., Incorporated, made contributions of cash in installment payments to R. T. Ervin & Co., and sold them on credit a heavy line of teas and coffees.

"(6) Contributions were not so made that the even sum of $15,000 was arrived at at any one period. The payments were continued until the indebtedness was far in excess of that sum. No new agreement or variation of the agreement cited was made either in writing or by parol, and no demand appears to have been made on the bankrupt firm for payment for goods delivered, or return of money prior to the filing of the claim in this case.

"(7) The demand of Ervin, Page & Co., Incorporated, is presented in the form of two claims: (a) A claim of $10,773.33 for cash loaned, described in the claim as 'balance of cash loaned after deducting the amount of $15,000 invested at the risk of the business'; and (b) a claim of $7,565.78 for merchandise sold and delivered.

"(8) Sales to the amount of $2,000 were made by Ervin, Page & Co., Incorporated, to Barnes & Co., succeeded by R. T. Ervin & Co., prior to the agreement cited. It was contended by the claimant that the amount of indebtedness incurred by R. T. Ervin & Co., prior to the execution of the agreement, and also the amount of indebtedness in excess of $15,000 after the execution of the agreement, should be treated by the referee in his consideration of the case as not affected in any way by the agreement cited, which it was alleged, if operative at all, should be confined to the amount of $15,000 therein provided.

"(9) The referee, after full consideration, cannot find upon this question of fact as requested by the claimant. R. T. Ervin & Co. were consumers of the products dealt in by Ervin, Page & Co., Incorporated, namely, teas and coffees. The agreement was entered into by Ervin, Page & Co., Incorporated, with a view to embark in a business venture in which they were to increase the sales of their wares, and participate in the profits and management of the business in which they had a joint control. The $15,000 mentioned in the agreement must be regarded as simply an amount supposed by Ervin, Page & Co., Incorporated, to be sufficient, as further amounts

were contributed without any new agreement, either verbal or written, and it is therefore to be implied that it intended all contributions subsequent to this agreement to be controlled by it. All indebtedness of the bankrupt to claimant incurred prior to the date of this agreement, if not by assent, actual or implied, contributed under it, the referee finds is not controlled by it. It is also in evidence that, up to the time of the insolvency of R. T. Ervin & Co., Charles W. Ervin, president of the firm of Ervin, Page & Co., Incorporated, and James G. Leiper, a director, were constant visitors at the place of business of R. T. Ervin & Co., and participated in the management of the business by giving directions and making suggestions.

"There is no question that the agreement between Ervin, Page & Co., Incorporated, and R. T. Ervin & Co. is a partnership agreement. Ervin, Page & Co., Incorporated, not only were to participate in the profits, but were entitled to a voice in the management of the business. A study of the later cases shows that if it appears from the whole agreement that the parties have joined in a common venture in which as principals they jointly are to share profits, and in a greater or less degree are entitled to a voice in directing the operations of the business, then they are partners, even though, as between themselves, there is an agreement of exemption from loss. Such an agreement does not take away from the contract its character as a partnership agreement. Moneys placed in the business under the guise of loans, for the purpose of paying the current expenses of the mutual undertaking, must be considered as partnership contributions. This has been the law since the time of the case of Waugh v. Carver, 2 H. Bl. 238, in which it was held that parties who formed a partnership by agreement to jointly manage a business could not, by an agreement between themselves (that losses should not be shared), destroy the rights of creditors.

"The only question to be considered is whether the claimant can sustain the proposition that, if the partnership agreement is ultra vires, then it should be held that the claimants were in the same position as if the agreement had not been entered into. The claimant deducted from the amount he claims the sum of $15,000, as the sum exposed to business risk, by reason of the agreement; but in the opinion of the referee, for the reasons heretofore stated, all indebtedness incurred from the date of the agreement is controlled by its construction. If the amount of $15,000 was by the agreement submitted to a business risk, then the money subsequently contributed for the purpose of the joint venture was subject to the same risk. To hold that a corporation can enter into a business with a firm on the basis of a participation in profits and management, enlarge and expand the business, and perhaps cause its insolvency, and then, by reason of the doctrine of ultra vires, not only escape liability, but enforce as a general creditor contribution from partners for the purpose of recovering the loss sustained, would be against public policy. The doctrine of ultra vires is a creation of the law for the protection of the public from the undue expansion of the business of corporations, and to compel them, under penalty of forfeiture of charter, to confine their operations to the powers defined in the grant from the state. A corporation is not allowed to retain a benefit obtained by an ultra vires act or escape a loss from a contract that has been executed. Stockholders or corporation creditors can restrain a corporation from entering into a contract not within the scope of its corporate grant, and defend against the enforcement of like contract that has not been executed. The cases cited by the counsel for claimant are of this class, and well illustrated by the case of Davis v. Railroad Co., 131 Mass. 258, 41 Am. Rep. 221, where railroad companies were enjoined from carrying out contracts guarantying the expenses of a musical festival.

"The restraint of ultra vires contracts, when executory, is a proper protection to stockholders, but when the contract has become executed, and the stockholders have remained passive, and allowed the rights of creditors to intervene, the corporation cannot escape the loss already sustained. In Green's Brice, Ultra Vires, p. 43, it is stated as a proposition of law that 'corporations cannot be rendered directly liable upon ultra vires transactions, and must account for the benefits received therefrom. As long as the transaction remains executory, it is established that it cannot be enforced; but

if it be executed, though in England it cannot be enforced or sued on, yet in the United States there seems some doubt whether the corporation would be allowed to set up the defense of ultra vires.' The distinction between the application of the doctrine of ultra vires, as to executory and executed contracts, is well established by decisions. In the case of Bauk v. Gray, 14 Barb. 471, a corporation leased to an individual its iron works under an agreement that it was to receive as rent one-fourth of the net profits of the iron manufactured. The superintendent of the iron works discounted drafts drawn on the corporation in a bank, and used the proceeds in carrying on the works. Suit having been brought by the bank against the corporation and the individual as co-partners, on the dishonored drafts, it was contended on behalf of the corporation that no partnership existed, as its officers had no power to enter into such a partnership which would be binding on it. Judgment, however, was rendered the plaintiff. Wright, J., makes the following observation in his opinion: 'I cannot think that a corporation may so shape its contracts relating to the business for which it was incorporated as to share jointly with an individual in the profits of such business, subtract its interests in the profits from the fund in which the creditors of the concern had a right to rely for the payment of the debts due them, and when called upon by such creditors be permitted to escape liability altogether, on the ground that the profits were realized as the partner of an individual, which relation a corporation could not legally occupy.'

"In Oil Creek & A. R. Co. v. Pennsylvania Transp. Co., 83 Pa. 160, in passing upon the defense of ultra vires, made by a corporation to an action brought against it, Paxson, J., observes: 'There were mutual covenants and mutual advantages. The defendants had enjoyed the advantages, such as they were, to the extent of the demand in this suit. The contract was executed, and to say now that it was ultra vires comes with exceedingly bad grace from the defendants.'

"In Wright v. Pipe-Line Co., 101 Pa. 204, where the defense of ultra vires was made to a suit upon a note, Paxson, J., says, inter alia: 'If the Oil City Pipe-Line Company exceeded its corporate powers in the purchase of this stock, can it now repudiate its note in the hands of a holder for value upon the ground that the transaction out of which it grew was ultra vires. The law never sustained a defense of this nature out of regard for a defendant; it does only where an imperative rule of public policy demands it.'

"Many other authorities were cited in the brief submitted on behalf of the trustee, but the above citations are sufficient to sustain the principle stated, that the doctrine of ultra vires can only be invoked as a defense where public policy demands it, and that where the consideration is executed it will not be enforced to work a wrong as against public policy. The question before the court is not that of a defense to the imposition of a further burden of loss on the stockholders of the corporation partner, but whether it can recover from the general creditors a portion of the money it lost in the business venture in which it participated in the profits and management. No authority has been cited upon which this proposition can be sustained. The cases referred to support the contention of the trustee, and for the reasons stated the referee is of the opinion that the claim of Ervin, Page & Co., Incorporated, as presented, should be excluded.

"As to a portion of the claim, the amount of indebtedness contracted before the execution of the agreement, if it can be shown that there was no arrangement by which this debt was merged in the indebtedness created under the agreement, a proof of claim for that amount should be admitted. It was suggested in argument that the indebtedness before the execution of the agreement was for goods sold and delivered to Barnes & Co., and that, as there was no evidence in writing of an agreement by R. T. Ervin & Co., the successors of Barnes & Co., to assume the debt, the statute of frauds would apply. The referee is of the opinion that, by implication of law, the firm of R. T. Ervin & Co. assumed their indebtedness, and a contract in writing was not necessary. The claim, as presented, is disallowed, with leave to the claimant to offer a proof of claim of money due prior to the execution of the agreement, and not arising from any transactions connected with said agreement."

N. Dubois Miller, for Ervin. Page & Co., Incorporated.
Reath & Reath and Albert B. Weimer, for the trustee.

J. B. McPHERSON, District Judge. I think the referee was clearly right in refusing to permit the claimant to share in the fund for distribution until the general creditors are paid. The claimant, although a corporation, was a partner de facto of the bankrupt firm, and the transactions now in controversy were executed transactions. This being true, I see no reason why the court should now help the corporation to undo what may be assumed to have been unlawful acts, or why the corporation should be regarded as if it had not really done what it now says was wrong. It signed a partnership agreement; advanced money to the firm in accordance with the agreement, and in furtherance of the partnership purposes, although, no doubt, in excess of the amount originally agreed upon, the excess being sometimes loosely, but, so far as general creditors are concerned, incorrectly, called "loans"; sold goods to the partnership, of which it was a member; and now asks a court of equity to say that nearly all of these voluntary completed acts should be treated as if they were uncompleted, and as if the bankrupts were seeking to compel the corporation to step outside the circle of its corporate powers. There is a sound difference between ultra vires acts already done and such acts still in the doing, and this is a case, I think, where the distinction may be properly applied. The ultra vires acts of the claimant undoubtedly helped to induce the general creditors to extend credit to the bankrupts, and the claimant should not now be permitted to repudiate these acts, and transform itself, by virtue of its own wrongdoing, from a partner into a general creditor.

The disallowance of the claim is approved.